UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

ANTONIO RAMSEY,

                Petitioner,                Case No. 1:13-cv-1210

v.                                          Honorable Robert J. Jonker

WILLIE SMITH,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner's criminal convictions stem from his role in the killing of Andrea Parnell. On December 15, 2010, a Muskegon County Circuit Court jury found Petitioner guilty of second degree murder, MICH. COMP. LAWS § 750.317, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On January 28, 2011, Petitioner was sentenced to 28 to 52 years' imprisonment for the second degree murder conviction, consecutive to a 2 year sentence for the felony-firearm conviction. Petitioner is currently serving that sentence at the Michigan Reformatory Correctional Facility in Ionia County. In his amended petition, filed by counsel, Petitioner raises two grounds for relief, as follows:

> I.        Petitioner was denied his 14th Amendment right to due process and his 6th Amendment right to a trial by a fair and impartial Jury because the Jurors were aware that he had a conviction for criminal sexual conduct in the second degree during deliberations without the knowledge or consent of the Petitioner or his Counsel.

II.     The [Petitioner's] convictions rest upon evidence that cannot fairly be
        deemed sufficient to establish guilt beyond a reasonable doubt of every
        element of the offense in violation of [Petitioner's] 14th Amendment right to
        due process and in contradiction to *Jackson v. Virginia*, 443 U.S. 307 (1979).

(Pet. 7-9, ECF No. 20, PageID.253-255.)  Respondent has filed an answer to the petition (ECF No.

24) stating that Petitioner's jury claim has been waived, is procedurally defaulted, and is without

merit, and further stating that his sufficiency claim has been procedurally defaulted and is also

without merit.  Upon review and applying the AEDPA standards, I find that Petitioner's first ground

for habeas relief is without merit and his second ground for relief has been procedurally defaulted,

but is also without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.     Trial Court Proceedings

Petitioner was charged with open murder[1] and possession of a firearm during the

commission of a felony in connection with the November 7, 2009, killing of Andrea Parnell.

Petitioner received a preliminary examination in the 60th District Court in Muskegon.  (ECF No. 25-

2.)  On November 24, 2009, Judge Maria Ladas Hoopes bound Petitioner over for trial in Muskegon

County Circuit Court on the charges.  (*Id.* at PageID.722-724.)  Petitioner's trial began on December

7, 2010, and it concluded on December 15, 2010, with the jury's verdict that found him guilty of

second-degree murder and guilty of the felony-firearm charge.[2]

---

[1] Under Michigan law, the charge of open murder allows a defendant to be convicted of first-degree or
second-degree murder or manslaughter, depending on the proofs. MICH. COMP. LAWS § 767.71; *see People v. Johnson*,
398 N.W.2d 219, 222-23 (Mich. 1986); *see also Tran v. Berghuis*, No. 1:06-cv-428, 2014 WL 4063832, at *7 n.4 (W.D.
Mich. Aug. 18, 2014); *Williams v. Jones*, 231 F. Supp. 2d 586, 589 (E.D. Mich. 2002).

[2] The Court will refer to the transcripts of the trial proceedings as follows:

Trial Transcript for December 7, 2010:          (Trial Tr. I, ECF No. 25-4, PageID.___)
Trial Transcript for December 8, 2010:          (Trial Tr. II, ECF No. 25-5, PageID.___)

Cynthia Hadden testified that she was the aunt of Andrea Parnell. During the month of November 2009, she lived at 503 Orchard in the city of Muskegon, Michigan. (Trial Tr. I, ECF No. 25-4, PageID.995.) Living with her at that time were Andrea and Andrea's daughter, Cynthia's parents, Geraldine and Rodell, and Cynthia's own son and daughter. (*Id.*) Ms. Hadden testified that Andrea was a student at Muskegon Community College and also spent her time babysitting Ms. Hadden's son. (*Id.* at PageID.996.) Ms. Hadden and Andrea both slept in bedrooms that were upstairs. She testified that there was an opening in a heating vent between the two rooms such that one could communicate with an individual in the other room. (*Id.* at 997-998.) During the early morning of November 7, 2009, around 2:00 or 2:15 in the morning, Ms. Hadden was in her upstairs room talking on the phone. (*Id.* at PageID.998-999.) At some point during the phone call, Ms. Hadden heard voices from the other room. She heard Andrea talking, and heard her tell an individual by the name of "Tutu" to stop messing with her, to stop touching her, to leave her alone, and to put something down. (*Id.* at PageID.999.) Ms. Hadden testified, however, that Andrea's statements did not raise any concern, and she continued with her phone call. (*Id.*) Later, perhaps after another hour or two, Ms. Hadden heard some footsteps and the front door slam. She assumed the other individual who had been with Andrea in her room had left. (*Id.*) Later, Andrea's one and a half year old daughter came into Ms. Hadden's room, which Ms. Hadden testified was unusual, and Ms. Hadden told her to go find Andrea. (*Id.* at PageID.1000-1001.)

---

Trial Transcript for December 9, 2010:      (Trial Tr. III, ECF No. 25-6, PageID.___)
Trial Transcript for December 10, 2010 a.m.:   (Trial Tr. IV, ECF No. 25-7, PageID.___)
Trial Transcript for December 10, 2010 p.m.:   (Trial Tr. V, ECF No. 25-8, PageID.___)
Trial Transcript for December 14, 2010:    (Trial Tr. VI, ECF No. 25-9, PageID.___)
Trial Transcript for December 15, 2010:    (Trial Tr. VII, ECF No. 25-10, PageID.___)

Sometime after that, Ms. Hadden testified that, while she was still on the phone, she heard a "weird moaning noise" repeating Andrea's name from outside the house. (*Id.* at PageID.1001-1002.) She assumed that it was one of Andrea's friends, because it was almost daylight. Ms. Hadden stated she was not worried about the individual because she assumed Andrea would take care of whoever was calling for her, and so she went back to her phone conversation. (*Id.* at PageID.1002.) After another twenty minutes, however, when she continued to hear the same moaning, Ms. Hadden paused her phone call and went downstairs to see what was going on. (*Id.*) She pulled the front door open and saw Andrea laying on the floor. (*Id.* at PageID.1004.) Ms. Hadden was soon joined by her mother, and they asked Andrea what was wrong and who had hurt her, but Andrea did not say anything except her name. (*Id.*) Ms. Hadden then testified that it appeared there was something wrong with Andrea's head, perhaps like she had been hit in the head with a brick. (*Id.* at PageID.1005.) They then called 911. (*Id.* at PageID.1006.) Ms. Hadden went to Andrea's room to collect Andrea's ID and insurance cards, and noticed that the items that were usually in Andrea's purse were all spread out across Andreas's bed. (*Id.* at PageID.1006-1007.) Ms. Hadden testified that she was able to find Andrea's wallet, but there was no money in it. She further testified that she knew there had been money in it earlier that day because she had gone with Andrea to the ATM. Ms. Hadden noted that Andrea was receiving financial aid for school. (*Id.* at PageID.1006-1007, 1014.) Ms. Hadden identified a brown coat that belonged to Andrea, and testified that it also had a removable hood. (*Id.* at PageID.1013-1014.)

Ms. Hadden then testified that she knew Tutu because he would come by the house two or three times during the week throughout the summer to speak with Andrea. She identified Petitioner as the individual named Tutu. (*Id.* at PageID.1015-1016.)

Geraldine Williams, Ms. Hadden's mother and Andrea's grandmother, testified that on the night of November 6, 2009, Andrea and her daughter came to Ms. Williams' room to say goodnight. (Trial Tr. I, ECF No. 25-4, PageID.1035-1038.) In the early morning of November 7, Andrea's daughter came into Ms. Williams' room and woke her up. Andrea's daughter put her hand on Ms. Williams, and she testified that it felt ice cold. (*Id.* at PageID.1038.) Ms. Williams took Andrea's daughter into bed with her, thinking that Andrea would come and get her at some point, and they both fell back asleep. (*Id.*) Later that morning, Ms. Williams woke up and went into the kitchen to start the day. While there, she heard a thump at the door. (*Id.* at PageID.1039.) She turned towards the front door and saw a person standing by the entrance. She heard someone say "Andrea" and Ms. Williams testified she assumed someone was there to visit Andrea. She went closer to the front entrance and realized the individual was in fact Andrea. (*Id.* at PageID.1041.) She could tell by looking at her coat and clothes that Andrea was bleeding. (*Id.* at PageID.1042.) Ms. Williams then called to her daughter, Cynthia, for help. (*Id.*) Andrea was leaning against the wall with her head tilted with blood coming from the right side of her neck. (*Id.* at PageID.1043.) Ms. Williams and Cynthia asked Andrea what had happened, but Andrea was only able to say "I'm Andrea." (*Id.* at PageID.1043.) Thereafter they called 911. (*Id.*) Finally, Ms. Williams testified that Andrea had set up a bank account at a local credit union in her daughter's name. Andrea's and Ms. Williams' names were also on the account. (*Id.* at PageID.1044.)

Earl Jordan testified that he lived next to 503 Orchard. (Trial Tr. II, ECF No. 25-5, PageID.1052.) He knew Andrea Parnell as his neighbor and was also familiar with a person named "Tutu" although he did not personally know him. (*Id.*) He testified that Tutu was next door with Andrea "all the time." (*Id.* at PageID.1053.) He last saw Andrea and Tutu together a couple of days

before the murder. (*Id.*) Mr. Jordan testified that he was awake during the late night of November 6, 2009 into the early morning of November 7, 2009. (*Id.* at PageID.1054.) He recalled hearing an ambulance and sirens on the morning of November 7. (*Id.*) But he did not recall hearing anything before that. (*Id.* at PageID.1054-1055.) Later that day, he was questioned by the police and recalled telling them he used to buy marijuana from Tutu. (*Id.* at PageID.1055.) Mr. Jordan testified that there was only one window, a bathroom window, that faced 503 Orchard. He also identified Petitioner as being Tutu. (*Id.* at PageID.1056-1057.)

Renecka Carter testified that the Ramsey's lived across the street from her on White Avenue. (Trial Tr. II, ECF No. 2505, PageID.1063-1066.) During the early morning of November 7, 2009, she was up talking to her brother on the phone. The door was open and she was lying on the couch looking out the door. (*Id.* at PageID.1066.) She testified that there were no street lights on White Avenue and that it was pitch black. (*Id.* at PageID.1067.) While she was lying on the courch, she heard a few gunshots. The shots were loud enough that she could hear them over her phone call and with the TV on. (*Id.* at PageID.1068.) Ms. Carter got up and shut the door. (*Id.*) Later that day, the police were across the street at the Ramsey house. (*Id.* at PageID.1069.)

Charles Strait testified that he was associated with the Outriders Motorcycle Club. (Trial Tr. II, ECF No. 25-5, PageID.1087.) They met at a house at 810 Williams Street. On the morning of November 7, 2009, he left the club with a friend at some point between 2:00 a.m. and 4:00 a.m. (*Id.* at PageID.1089.) They left the house to drive towards Orchard Street, and as they left the property Mr. Strait saw two individuals sitting on the curb near the club house. (*Id.* at PageID.1090.) Mr. Strait asked whether they were OK. While the male responded that they were OK, the female said she was not. Mr. Strait testified he thought they were boyfriend and girlfriend

and had been arguing.  (*Id.*)  The male had his arm around the female, but Mr. Strait testified that

the female was not hugging the male back.  (*Id.* at PageID.1091-1092.)  Mr. Strait and his friend then

left, and Mr. Strait called another club member, Glenn Hewitt, who was still at the club house, and

told him what he had just seen.  (*Id.* at PageID.1092-1093.)

Glenn Hewitt testified that he knew Mr. Strait through the motorcycle club.  (Trial

Tr. II, ECF No. 2505, PageID.1099.)  On the early morning of November 7, 2009, Charles Strait

called him to tell him there were two individuals sitting out in front of the clubhouse.  Mr. Hewitt

went out to them, but after only a few seconds both individuals got up and walked across the street.

(*Id.* at PageID.1102.)  He testified that the female was wearing a brown jacket and brown pants and

that the male had dark clothing on.  (*Id.* at PageID.1103.)  Later that morning, he spoke with a few

police detectives.  (*Id.* at PageID.1104.)

Kasheena Ruffin testified that she was a close friend of Andrea Parnell. (Trial Tr. II,

ECF No. 25-5, PageID.1113.)  On the evening of November 6, 2009, she and Andrea went to the

movies with Kasheena's sister Jasmine.  (*Id.*)  During the movie, Andrea left the theater to take a

phone call, but then returned.  (*Id.* at PageID.1114.)  After the movie, the three went to Burger King

to get something to eat, and then Kasheena and Jasmine took Andrea back to her home on Orchard

Street.  (*Id.* at PageID.1114-1115.)  About five minutes after dropping her off, Kasheena talked to

Andrea on the phone.  Andrea wanted a ride to go pick up some marijuana, but Kasheena told her

that she would not be able to give Andrea a ride.  (*Id.* at PageID.1115.)  Kasheena then testified that

she knew Andrea and Petitioner to be good friends.  (*Id.* at PageID.1116.)  She also knew that

Andrea would buy marijuana from Petitioner.  (*Id.* at PageID.1121.)  Andrea and Petitioner had a

friendly relationship thoughout the summer of 2009, but Kasheena said it had toned down somewhat by October. (*Id.* at PageID.1127.)

Jasmine Ruffin testified that she went to the movies with her sister and Andrea Parnell on November 6, 2009. (Trial Tr. II, ECF No. 25-5, PageID.1130.) After the movie, she and Kasheena dropped Andrea off at Andrea's house on Orchard Street. (*Id.* at PageID.1130.) Shortly after dropping Andrea off, Jasmine received a call from Andrea, and Andrea asked to speak with Kasheena. (*Id.* at PageID.1131.) Jasmine also testified that she was with Andrea the day before going to the movies and saw Andrea with about three hundred dollars in cash. (*Id.* at PageID.1134.) This was not unusual because Andrea always kept a couple hundred dollars on her. (*Id.* at PageID.1139.) Jasmine testified she knew Petitioner both from school and from the neighborhood. (*Id.* at PageID.1136.) She further testified that Petitioner wanted to be Andrea's boyfriend, but that Andrea became upset when she found out he was actually seventeen years of age instead of nineteen, as he had said. (*Id.* at PageID.1137.)

Jelah Tunstull testified that Andrea Parnell was his daughter's mother. (Trial Tr. II, ECF No. 25-5, PageID.1143.) In November 2009, he was not living with Andrea and was in fact in another relationship. (*Id.*) Though Andrea had custody of their daughter, he still saw Andrea and his daughter from time to time, and gave Andrea money when he could. (*Id.* at PageID.1144.) He knew Andrea to be a "good girl" who would go to school, go home, and take care of the baby. (*Id.* at PageID.1145.) Jelah testified that he had a good relationship with Andrea, that they planned to live together, and were on a waiting list for an apartment. (*Id.* at PageID.1146-1147.) Shortly before November 6, 2007, Jelah asked to borrow some money from Andrea. She told him she would withdraw some money from the bank and call him when she had it. (*Id.* at PageID.1146.) On

November 6, 2009, he called Andrea. At the time, she did not answer, but called him back about fifteen minutes later and said she was at the movies with her friends. (*Id.* at PageID.1147.) He told her to call him when she got home and she said she would. Jelah testified that Andrea wanted some marijuana and he said he would bring her some. (*Id.* at PageID.1148.) That was the last time he spoke with her. (*Id.*) He spent that night with an ex-wife and the daughter he had by his ex-wife. The next morning he received a call and went to Andrea's house on Orchard Street. (*Id.* at PageID.1149.) Jelah testified that he knew Petitioner, who was a cousin of Jelah's ex-wife, since Petitioner was a baby. (*Id.* at PageID.1151.) On a few occasions, Petitioner had bragged to Jelah about having access to a gun. (*Id.* at PageID.1153.)

Kenneth Wallace testified that Petitioner was his cousin. (Trial Tr. II, ECF No. 25-5, PageID.1171.) On November 6, 2009, Kenneth's friend Donald picked Kenneth up from school and they went to hang out for the day. Later, the two went to Petitioner's house. (*Id.* at PageID.1174.) At around 9:00 or 10:00 p.m. Kenneth's brother Jamar then came over and picked up Kenneth and Petitioner and took the two of them to his apartment at Glen Oaks. (*Id.*) Later that evening, Jamar and Kenneth drove Petitioner back to his house on White Avenue, and then returned to the Glen Oaks apartment. (*Id.* at PageID.1175.) Kenneth testified that they then went to bed, because Jamar had plans to take his girlfriend, Amanda, to the doctor the next morning. (*Id.* at PageID.1176.) During the early morning of November 7, 2009, around 4:00 a.m., Kenneth received a phone call from a number he did not recognize, but he recognized Petitioner as the voice on the other line. (*Id.* at PageID.1179.) Petitioner told Kenneth he had just shot somebody. (*Id.* at PageID.1180.) In the background, Kenneth could hear a female voice crying for her phone and asking to call her grandmother. (*Id.*) The voice also said her head hurt. (*Id.*) Kenneth said he then hung up. Then

Petitioner called back, but Kenneth did not answer it the first time. Kenneth then called the number back and Petitioner asked to speak to Jamar to get a ride. (*Id.* at PageID.1181.) Kenneth woke Jamar up and gave him his phone. Jamar spoke with Petitioner, and then handed the phone back to Kenneth, who went back to sleep. (*Id.* at PageID.1181-1182.)

On the morning of November 7, 2009, Jamar took Amanda to the doctor, and Kenneth stayed behind to babysit Jamar's child. (*Id.* at PageID.1183.) While they were gone, Petitioner arrived. When Jamar and Amanda returned, Kenneth saw Petitioner and Jamar speak, but was not a part of the conversation. (*Id.* at PageID.1184.) Petitioner stayed at the apartment the rest of the day through the evening. (*Id.* at PageID.1185.) Then, when Kenneth went outside to smoke, he was approached by a police officer who asked his name and then took him into custody. The officer asked whether Petitioner was inside the apartment and Kenneth indicated he was. (*Id.* at PageID.1171-1172.) The prosecutor then asked Kenneth whether he had ever seen Petitioner with a gun, and Kenneth responded that he had seen Petitioner with a small gun at Petitioner's house a short time before November 7, 2009. (*Id.* at PageID.1185-1186.)

Bassam Thweny testified that he managed the Wood Street market in the city of Muskegon. (Trial Tr. II, ECF No. 25-5, PageID.1240.) He had video cameras that were recording inside his store, and provided some recordings to the police. (*Id.* at PageID.1240-1241.) On November 4, 2009, he cashed a student loan check for $900. (*Id.* at PageID.1242.)

Officer Scott Zonnebelt testified that he participated in a search warrant of the Ramsey residence on White Avenue. (Trial Tr. II, ECF No. 25-5, PageID.1249.) He searched the west bedroom on the second floor of the residence. (*Id.* at PageID.1250.) Inside the bedroom, there was an access door to the attic. When the officer opened it he found "miscellaneous random junk."

(*Id.* at PageID.1251.)  Just inside the access door, however, there was a shoe box.  Inside the box, Officer Zonnebelt observed a Wal-Mart receipt, empty baggies, a bullet, and a hall pass with the name Antonio Ramsey on it, but the officer did not manipulate the items to see if there was anything underneath the items he saw.  (*Id.* at PageID.1251-1253.)  The officer also saw a separate shoe box, that had been broken, and observed several empty baggies and an locker ID card inside of it with Antonio Ramsey's name on it.  (*Id.* at PageID.1253-1254.)

Officer Ron Smith testified that he was dispatched to 503 Orchard Street during the early morning of November 7, 2009, after receiving a report that a female had been assaulted.  (Trial Tr. III, ECF No. 25-6, PageID.1277.)  When he arrived, he was met by the victim's aunt and grandmother.  He made contact with Andrea, who was moaning, but not able to form sentences, and was unable to answer the officer's questions.  (*Id.* at PageID.1278.)  He was able to see that the back of her head was bleeding.  (*Id.*)  Paramedics arrived and placed Andrea inside an ambulance.  One of the paramedics then came to him and said that Andrea was becoming violent and they needed his assistance.  Officer Smith went into the ambulance and helped to physically restrain Andrea.  The officer testified that her actions were consistent with a closed head injury.  (*Id.* at PageID.1279-1281.)  The officer radioed his lieutenant and advised that the case was more severe than first thought, and the lieutenant indicated he wanted the scene to be processed by an evidence technician.  (*Id.* at PageID.1281.)  After speaking with the lieutenant, the officer was informed that Andrea's injuries were likely due to a gunshot.  (*Id.* at PageID.1282.)  The officer contacted his command and he blocked off the area around the house.  He then went to the emergency room where Andrea was being treated.  (*Id.*)

Deb Lambert testified that she worked for the Muskegon Co-Op Federal Credit Union. (Trial Tr. III, ECF No. 25-6, PageID.1286.) She identified a banking statement with an account held in the name of Andrea's daughter for the months of October 2009 through December 2009. (*Id.* at PageID.1286-1287.) The statement indicated that on November 5, 2009, a deposit was made into the account in the amount of seven hundred dollars. (*Id.* at PageID.1287.)

Detective Clay Orrison testified that he collected evidence in connection with this case. After being briefed, he first went to Hackley Hospital where Andrea Parnell was being treated. (Trial Tr. III, ECF No. 25-6, PageID.1291.) There, he learned that Andrea had died. He collected her clothing, as well as a tooth that had been knocked out while she was being intubated. (*Id.*) He then went to the house on Orchard after a search warrant had been obtained, and took several photographs. (*Id.* at PageID.1292.) He also used a metal detector in the area to check for bullet casings, but found none. (*Id.* at PageID.1294.) He saw a pool of blood in the front foyer area, but there was nothing that would indicate a gun fight had taken place there because he did not see any blood that had been cast off onto the walls. He took photos and swabs of the blood. (*Id.* at PageID.1296.)

The detective also collected evidence at the Ramsey evidence on White Avenue. (*Id.* at PageID.1310.) When he arrived, he was directed to an upstairs bedroom and to an attic crawl space that was accessed through the bedroom. (*Id.* at PageID.1310-1311.) There he collected and took photographs of baggies, a Wal-Mart receipt, an a .22 long bullet. (*Id.* at PageID.1311.) When he emptied the contents of the box he found an additional bullet. (*Id.* at PageID.1312.) The receipt showed a purchase of ammunition from Wal-Mart. (*Id.*) He took the receipt to Wal-Mart, and the store was able to determine the specific type of ammunition that had been purchased. He also asked

whether there was video of the transaction when the ammunition was purchased, but was unsuccessful because the purchase was past the date that Wal-Mart retained their files. (*Id.* at PageID.1313.) He was able to purchase a box of ammunition that was exactly what had been purchased as indicated by the receipt. (*Id.* at PageID.1314.) The purpose of doing so was to see if there was a match between those bullets and those that were obtained from Andrea's wounds. (*Id.*)

The detective also collected a hall pass from the box that had Petitioner's name on it and was dated September 16. (*Id.* at PageID.1316.) In another box he noticed sandwich baggies and loose plant material. There was also a razor blade that helped a dealer chop up narcotic material into various sizes. (*Id.* at PageID.1319.) Detective Orrison testified that in his experience, the shoe box was likely a containment box for drugs. The parties then stipulated that Petitioner lived at the White Avenue residence. (*Id.* at PageID.1320.)

While at the White Avenue home, the detective learned that Petitioner might be at the Glen Oaks apartments. (*Id.* at PageID.1321.) He met with the apartment's management, and set up surveillance of the building with several other detectives while they determined which apartment Petitioner might be in. (*Id.*) After zeroing in on the correct apartment, an individual left the apartment and, after questioning, confirmed that Petitioner was currently inside the apartment. (*Id.* at PageID.1322-1323.) The officers then went into the apartment and arrested Petitioner. They did a custodial search and located two fifty-dollar bills and five-twenty dollar bills in Petitioner's pants pocket. (*Id.* at PageID.1324.) The detective then identified a red sweatshirt that Petitioner had been wearing when he was taken into custody. (*Id.* at PageID.1325-1326.)

The detective further testified that he searched the area around the Orchard Street residence to look for a firearm and during his search, he was stopped by some individuals from a

motorcycle club who said that there was a suspicious situation that had happened on the night of November 6. (*Id.* at PageID.1329.) In front of the motorcycle club he was able to obtain a jacket hood with fur trim. (*Id.* at PageID.1333.) The detective testified that the police were never able to obtain a firearm, but stated that it was extremely easy to get rid of a gun. It could be thrown away, or dropped in a marsh or sewer drain. (*Id.* at PageID.1331.)

Sergeant Beth Clark testified as an expert in firearms and tool mark identification. (Trial Tr. III, ECF No. 25-6, PageID.1402.) She examined the unfired cartridges that were purchased by Detective Orrison. She was asked to separate a bullet from one of the unfired cartridges. She also examined three fired bullets that were in evidence and was able to classify one as a .22 class caliber. (*Id.* at PageID.1410-1412.) She testified that they all appeared to be from a long rifle caliber. (*Id.* at PageID.1412-1416.) She could not tell whether there was a relationship between the two unfired long caliber cartridges she had disassembled and the three fired bullets. (*Id.* at PageID.1436.)

Kevin Streeter testified as an expert in trace evidence. (Trial Tr. III, ECF No. 25-6, PageID.1442.) Mr. Streeter tested the two unfired .22 caliber bullets. (*Id.* at PageID.1445.) He also tested gun powder residue that was obtained from Andrea Parnell's body. (*Id.*) He compared the gunpowder from the unfired bullets to the residue from Andrea using a microscope. (*Id.* at PageID.1446.) He concluded that the powder from the unfired bullets was not similar to the powder removed from Andrea. (*Id.*) He then compared the residue to the short caliber bullets Officer Orrison obtained. He determined that the chemical makeup was similar with only a very slight variation between the two. (*Id.* at PageID.1149.) The prosecutor identified the inconsistency between Officer Clark's testimony regarding the long caliber bullets and the fact that the gunpowder did not match the unfired long caliber bullets but did match the short caliber bullets. (*Id.* at

PageID.1450-1451.)  Mr. Streeter noted that it was possible that the powder from the shorts could have also been used in the longs with a different manufacturer.  (*Id.* at PageID.1451.)  Mr. Streeter testified that his analysis did not exclude Petitioner as possessing or using the bullets that were used to kill Andrea.  (*Id.* at PageID.1452-1453.)

Ann Hunt testified as an expert in the area of DNA profiling and statistical analysis. (Trial Tr. III, ECF No. 25-6, PageID.1464.)  Ms. Hunt tested evidence from a glass jar, a sweatshirt, swabs from an interior door, fingernail clippings, a swab from a shoe, a swab from a hood, and two known samples from Andrea and Petitioner. (*Id.* at PageID.1469-1470.)  Regarding the glass jar, Ms. Hunt identified at least three donors.  She determined that both Andrea and Petitioner could not be excluded as being a donor to the DNA that was obtained from the jar.  (*Id.* at PageID.1471.)  On one of the sweatshirt cuttings, she was able to identify Petitioner as the major donor of DNA evidence. (*Id.* at PageID.1476.)  She identified three donors from the swab taken from the interior screen door. She excluded Petitioner as being a donor on that swab.  (*Id.* at PageID.1477.)  Ms. Hunt also identified Andrea as the major donor of the DNA obtained from the right fingernail clippings and excluded Petitioner as the source of the minor DNA types.  (*Id.* at PageID.1478.)  The left fingernail clippings had no DNA that was not from Andrea, and there was no DNA identified from the left shoe swab.  (*Id.* at PageID.1479.)  Swabs taken from the hood revealed a major donor from Andrea.  (*Id.* at PageID.1478.)  She could not make a conclusive determination regarding Petitioner.  (*Id.*)

Ms. Hunt also tested swabs taken from a black sweatshirt that had a blood stain on it.  (Trial Tr. IV, ECF No. 25-7, PageID.1504.)  She analyzed a blood stain, as well as a few other areas including the inside cuffs, collar, and the tag on the sweatshirt.  (*Id.*)  Ms. Hunt testified that the DNA profile from the bloodstain matched the profile obtained from Andrea.  Petitioner was

excluded as a source of the DNA from the blood stain. (*Id.* at PageID.1505.) On the inside cuffs, both Andrea and Petitioner could not be excluded as a donor to the DNA. (*Id.*) On the inside collar, there were at least two donors. Petitioner could not be excluded as a donor, and the results were inconclusive regarding Andrea. (*Id.* at PageID.1508.) Ms. Hunt reached similar results regarding testing on the tag inside the sweatshirt. (*Id.* at PageID.1509.)

Dr. Michael Markey testified as an expert in forensic pathology regarding the autopsy that was performed on the body of Andrea Parnell. (Trial Tr. IV, ECF No. 25-7, PageID.1566-1567.) During this testimony, the prosecution introduced pictures of Andrea Parnell's wounds. (*Id.* at PageID.1567-1570.) Dr. Markey testified that he took photographs and x-rays of Andrea's body and recovered bullet fragments from her body. (*Id.*) Dr. Markey described the wounds that Andrea sustained and noted that a wound on the right side of the head was from an intermediate range of fire, meaning that when she was shot, the gun was far enough away from her skin that it was not in contact with her skin, but close enough that materials other than the bullet, such as soot, were deposited on her skin. The bullet from this wound did not penetrate Andrea's skull. (*Id.* at PageID.1577-1578.) There were two other wounds on the left side of Andrea's head. One of the wounds indicated it had been from a closer, or contact, range of fire but, as with the wound on the right side of her head, did not penetrate her skull. (*Id.* at PageID.1580-1586.) The second wound on the left side had characteristics of intermediate range of fire and penetrated Andrea's skull and entered her brain. (*Id.* at PageID.1585-1586.)

Amanda Hershey testified that during November 2009 she was living with Jamar Frederick, her boyfriend, at her Glen Oaks apartment. (Trial Tr. V, ECF No. 25-8, PageID.1606.) Ms. Hershey testified that she was scheduled for an early morning doctor's appointment on

November 7, 2009. She had made the appointment about four days before the scheduled visit. (*Id.* at PageID.1607.) On November 6, 2009, she was in the apartment with Jamar and his brother Kenneth Wallace. She testified that she went to sleep around midnight. (*Id.* at PageID.1608.) When she left with Jamar to go to her appointment on the 7th, Petitioner was not at her apartment. (*Id.* at PageID.1609-1610.) When she returned, she was groggy. She had been under anesthesia and had to be carried into the apartment. (*Id.* at PageID.1610.) She did not recall who was in the apartment when she returned and she testified she went back to bed. (*Id.*) When she woke up, around 5 o'clock, Petitioner was asleep on the couch in her apartment. She got up to get something to eat, and shortly thereafter the police entered the apartment looking for Petitioner. (*Id.* at PageID.1611-1612.)

Jamar Frederick testified that he was the boyfriend of Amanda Hershey. (Trial Tr. V, ECF No. 25-8, PageID.1636.) Petitioner was his cousin by blood. (*Id.* at PageID.1639-1640.) On the evening of November 6, 2009, Petitioner was with Jamar at the Glen Oaks apartment. That night, around midnight, Jamar drove Petitioner back to Petitioner's home on White street. (*Id.* at PageID.1640-1641.) Jamar then drove back to the Glen Oaks apartment, played a video game, and then turned his cell phone off (which he testified was his habit when going to sleep) and went to bed. (*Id.* at PageID.1641-1642.) He was awakened by his brother, Kenneth Wallace, during the early hours of November 7. Petitioner had called Kenneth's phone, and wanted to speak with Jamar about getting a ride. (*Id.* at PageID.1642-1643.) Jamar could tell that Petitioner was outside, because he could hear the wind blowing. He also heard a female voice who called Petitioner by his nickname. (*Id.* at PageID.1643-1644.) Jamar declined to give Petitioner a ride, and Jamar gave the phone back to his brother and went back to sleep. (*Id.* at PageID.1644.) Later that morning, Jamar left with Amanda to go to the doctor's appointment. When he left, Petitioner was not at the apartment, though

Kenneth Wallace was. (*Id.* at PageID.1645.) Jamar returned to the Glen Oaks apartment on the afternoon of November 7 at around 2:00 p.m. He was with Amanda who was "drugged up." (*Id.*) Sometime later, Petitioner arrived, wearing a black hoodie and jeans. (*Id.* at PageID.1646.) Jamar and Petitioner spoke, and Petitioner told Jamar he had "messed up" and that he had shot somebody. (*Id.* at PageID.1646-1647.) Petitioner also told Jamar he had taken money from the individual, but would not say who he had shot. (*Id.* at PageID.1649.)

Mitchell Pierce testified that in September of 2010 he was in a holding cell at a jail with several other individuals. He overhead two of them talking about the crimes that they had committed. (Trial Tr. V, ECF No. 25-8, PageID.1679-1680.) One individual said he was accused of shooting his girlfriend over tuition money. Mitchell asked the individual if he had did it, and the individual said "no" but shook his head at the same time to indicate that he had. The individual was grinning as he did so. (*Id.* at PageID.1680-1681.) Mr. Pierce identified Petitioner as the one who made the statements. (*Id.* at PageID.1681-1682.)

Detective Rick Bleich testified that he was involved in the investigation of Andrea's death. As part of that investigation, he obtained a search warrant to obtain a DNA swab from Petitioner. (Trial Tr. V, ECF No. 25-8, PageID.1690.) He engaged in conversation with Petitioner, and during the course of that conversation, Petitioner told the detective that he was known on the streets as a "bullet man" because he sold bullets. The detective also asked Petitioner about the $200 that was earlier found on Petitioner, and Petitioner had no explanation as to where the money had come from. (*Id.* at PageID.1692.) The detective further testified that during the investigation, Petitioner admitted being at the Orchard Street address on the night in question and further admitted that he knew Andrea Parnell was receiving student loans. (*Id.* at PageID.1692-1693.) Petitioner

- 18 -

denied, however, being the male individual that was seen outside the motorcycle club. (*Id.* at PageID.1694.)

Detective Kory Luker testified that he was the detective assigned to investigate Andrea Parnell's death. (Trial Tr. VI, ECF No. 25-9, PageID.1721.) He was assigned to the case around 9:00 a.m. on November 7, 2009. He first went to the hospital and spoke with the doctors, and then met with Andrea's family and took their statements. (*Id.* at PageID.1722.) He received information that Petitioner had been in the Orchard Street house previously, and also received Petitioner's phone number. The detective then was able to obtain the phone records both for Petitioner's phone as well as Andrea's. (*Id.* at PageID.1723.) Based off that search, the detective was able to obtain a search warrant for Petitioner's residence on White street. During the course of the search, the detective spoke with Petitioner's mother and learned that she had driven Petitioner to the Glen Oaks apartment around 9:00 or 10:00 that morning. (*Id.* at PageID.1724-1725.) The prosecution recalled Detective Bleich, who testified that Petitioner admitted to him that he called Kenneth Wallace at the Glen Oaks apartments and asked to speak to Jamar so that he could get a ride. (Trial Tr. VI, ECF No. 25-9, PageID.1783.)

After that, the prosecutor rested and Petitioner moved for a directed verdict. (*Id.* at PageID.1796-1797.) The trial court denied the motion. (*Id.* at PageID.1799.) Thereafter, the defense began its presentation by calling James Culp to testify. Mr. Culp testified that around midnight on November 6, 2009, he saw Petitioner with two individuals identified as KJ and Jamar (likely Kenneth Wallace and Jamar Frederick) at Sunny Mart. (*Id.* at PageID.1805.) At around 2:30 on the morning of November 7, Petitioner called Mr. Culp to ask if he wanted to hang out and play games. (*Id.* at PageID.1806.) Mr. Culp declined because he wanted to go to sleep. (*Id.*)

Next, Steven Hershey testified that he was the brother of Amanda Hershey. He testified he had been interviewed by Detective Luker regarding the death of Andrea Parnell. (Trial Tr. V, ECF No. 25-9, PageID.1811-1812.) He told the detective that during the early morning hours of November 7, 2009, he was at his sister's apartment. When he arrived, roughly around midnight between November 6 and 7, neither Jamar Frederick nor Kenneth Wallace were at the apartment. (*Id.* at PageID.1813-1814.) When he woke up, around 10:00 or 11:00 on the morning of November 7, there was no one else beside him in the apartment and he left soon after he woke up. (*Id.* at PageID.1814.)

Tamara Ramsey, Petitioner's mother, testified that Petitioner and his cousin, Jamar, got along fine but that on some occasions Jamar would borrow things from Petitioner and would not return them. Ms. Ramsey identified a pair of shorts as well as a cell phone as items that Jamar would take from Petitioner. (Trial Tr. V, ECF No. 25-9, PageID.1820-1821.) She admitted dropping her son off at the Glen Oaks apartment sometime between 9:00 and 10:00 on the morning of November 9, 2009. (*Id.* at PageID.1825.) Thereafter, the defense rested.

After hearing closing arguments and receiving instructions, the jury deliberated for a little over six hours. (Trial Tr. VI, ECF No. 25-10, PageID.1928-1931.) At the conclusion of deliberations, the jury returned a guilty verdict on count one for second degree murder and a guilty verdict on count two for felony firearm. (*Id.* at PageID.1931.)

At the sentencing hearing, held on January 28, 2011, the trial court heard argument on a defense motion for a directed verdict, as well as a motion for new trial. Regarding the latter motion, the trial court recounted that after Petitioner's trial was completed, the presiding officer met with the jurors in his chambers in order to thank them and chat about a state court experiment

concerning the ways jurors are allowed to deliberate and interact with the trial process. The presiding officer then mentioned that he would be sentencing Petitioner and that one of the things he would be considering in determining the sentence was Petitioner's previous conviction, when Petitioner was a juvenile, for second-degree criminal sexual conduct. (Sentencing Hr'g Tr., ECF No. 25-11, PageID.1941.) Several jurors then volunteered that they were aware of the conviction because it was mentioned in one of the prosecution's exhibits. (*Id.* at PageID.1941-1942.)

After the trial court recited this experience, the prosecutor stated that the evidence in question was a "Michigan Sex Offender Registration, address verification, offender receipt" and was important to establish Petitioner's residency at the White Street address. When he included it in the evidence book he was not aware that it contained the information regarding the conviction. (*Id.* at PageID.1943-1944.) After hearing argument, the trial court denied the defense's motions. (*Id.* at PageID.1951, 1972.) The trial court then sentenced Petitioner to two years' imprisonment for the felony firearm conviction, consecutive to 28 to 53 years' imprisonment for the second degree murder conviction. Petitioner was given 446 days of credit. (*Id.* at PageID.2018.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 7, 2011, raised several issues and sub issues:

I. Whether the Trial Court's denial of the Defendant's request for a *Remmer* hearing violated the Defendant's rights to due process under the Fourteenth Amendment and represents a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

II. Whether the Trial Court committed reversible error holding that a photograph, showing the Defendant was a registered sex offender, that was allegedly published to the Jury during their deliberations without the

knowledge or consent of the Defense Counsel or the Trial Court was intrinsic properly admitted evidence and not extrinsic evidence?

III.    Whether the Trial Court abused it's [sic] discretion determining that a photograph showing that the Defendant was a registered sex offender, that was allegedly published to the Jury during their deliberations without the knowledge or consent of Defense Counsel or the Trial Court was properly admitted evidence that was not unduly prejudicial?

IV.    Did the prosecution fail to meet the obligation to ensure the Defendant was provided a fair trial?

V.    Whether the Trial Court abused its discretion by allowing the use of grizzly [sic] autopsy photographs that addressed no disputed point of evidence or advanced any of the burdens of the prosecution and had no evidentiary value?

VI.    Whether the Trial Court abused its discretion in denying the Defendant's request for the Jury to be instructed on the offenses of voluntary manslaughter and involuntary manslaughter.

VII.    Whether the Defendant's conviction for Second Degree Murder and Felony Firearm are against the great weight of the evidence.

(*See* Def.-Appellant's Br. on Appeal, ECF No. 25-17.) By unpublished opinion issued on April 26, 2012, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 4/26/12 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 25-15, PageID.2124-2128.)

      Petitioner filed an application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same seven claims, albeit not verbatim, raised before and rejected by the Michigan Court of Appeals. By order entered November 7, 2012, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., ECF No. 25-18.)

### C.    Post-conviction relief

After the Michigan Supreme Court's decision, Petitioner filed a habeas action in this Court. In his first amended petition, Petitioner raised the two issues referenced above. In an Opinion and Order dated February 12, 2014, Chief Judge Robert J. Jonker found that Petitioner had raised both exhausted and unexhausted claims, and ordered Petitioner to show cause why he should be entitled to a stay in the proceedings. (ECF Nos. 11, 12.)   On March 12, 2014, Petitioner filed a motion to stay so that he could further pursue his unexhausted claim in the state courts. (ECF No. 13.) Petitioner's motion was granted on April 3, 2014, and the case was administratively closed. (ECF No. 15.)

Petitioner returned to the state trial court by filing a motion for relief from judgment on April 30, 2014, that raised only the unexhausted claim. (*See* 4/30/14 Mot. For Relief From J., ECF No. 25-19, PageID.2421-2439.) In an Opinion and Order dated May 23, 2014, the trial court denied Petitioner's motion, relying on MICH. CT. R. 6.508(D). (*See* Op. & Ord. Den. Mot. For Relief From J., ECF No. 25-13, PageID.2070-2071.) Petitioner filed a motion for reconsideration that was denied by the trial court on August 4, 2014. (*See* 8/4/14 Op. & Ord. Den. Mot. For Recons., ECF No. 25-16, PageID.2130-2134.) Petitioner appealed the trial court's decision but, in an unpublished decision dated October 21, 2014, the Michigan Court of Appeals denied Petitioner's application for leave to appeal because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (*See* 10/21/14 MCOA Ord., ECF No. 25-19, PageID.2384.) Citing the same court rule, the Michigan Supreme Court denied relief in an order dated July 28, 2015. (*See* 7/28/15 Mich. Ord., ECF No. 25-20, PageID.2560.)

Having exhausted the claim, Petitioner filed a motion in this Court to lift the administrative stay on August 15, 2015. (ECF No. 16.) On September 24, 2015, the Court granted the motion and reopened the case. The Court also directed Petitioner to file a second amended petition. (ECF No. 18, PageID.245.) Petitioner filed the amended petition on October 20, 2015, which again raised the two claims listed above. (ECF No. 20.)

The case is accordingly ripe for decision.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and

- 24 -

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state

court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I. Denial of Right to Impartial Jury Due to Extraneous Prejudicial Influence.

In his first ground for habeas relief, Petitioner contends that his constitutional rights to due process and an impartial jury were violated when the jury considered the Michigan Sex Offender Registration receipt during their deliberations. Petitioner maintains that neither the trial court nor his counsel were aware that the receipt was included in the exhibits made available to the jury.[3]

As noted above, this issue was squarely addressed by the trial court at Petitioner's sentencing hearing where it heard argument on Petitioner's motion for a new trial and denied the motion, The Michigan Court of Appeals upheld the trial court's determination, stating:

> On appeal, defendant argues that the trial court erred in denying his request for a hearing under *Remmer v United States*, 347 US 227; 74 S Ct 450; 98 L Ed 654 (1954). According to defendant, he was entitled to a *Remmer* hearing to investigate whether the jury, upon seeing a sex offender registration receipt in deliberations, became biased and partial. Defendant also argues that the trial court erred in determining that the registration receipt was not an extraneous influence. We review a trial court's decision whether to hold an evidentiary hearing for an abuse of discretion, *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). We also review the decision whether to grant a new trial for an abuse of discretion *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Unger*, 278 Mich App at 217.
>
> The trial court informed the parties that when it spoke to the jurors at the conclusion of trial, the jurors informed it that they had learned from an exhibit that defendant had a prior conviction for second-degree criminal sexual conduct. The exhibit was

---

[3] Respondent argues Petitioner's ground for relief appears to be procedurally defaulted as he failed to object to the inclusion of the evidence during the trial. However, where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). The Court will do so here.

"exhibit 1," which was described as a "photograph book" of pictures taken during the investigation of the death of the victim, Andrea Parnell. Exhibit 1 contained a piece of paper entitled "Michigan Sex Offender Registration, address verification, offender receipt." According to the prosecutor, exhibit 1 was put together before trial. The prosecutor acknowledged that he was not specifically aware that the slip of paper placed in the book as a part of the returns from the search of defendant's residence was a sex offender registration receipt. The sex offender registration receipt was included in the exhibit because it was the only proof of residence for defendant that was found in the search of defendant's house. When the prosecutor moved to admit exhibit 1 into evidence, defendant stated that he had no objection to the admission of the exhibit. At the hearing on defendant's motion for a *Remmer* hearing, defendant's counsel admitted that he stipulated to the admission of exhibit 1, but explained that he, also, failed to perceive that it included the sex offender registration receipt.

We conclude that defendant, when he consented to the admission of exhibit 1, waived the issue of whether he is entitled to relief because the jury, during deliberations, learned of his status of a sex offender. A "[d]efendant may not assign error on appeal to something that his own counsel deemed proper at trial." *People v Barclay*, 208 Mich App 670, 673; 528 NW2d 842 (1995); see also *People v Witherspoon*, 257 Mich App 329, 333; 670 NW2d 434 (2003) ("[A]n appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence.").

Regardless, the sex offender registration receipt was not an extraneous influence. The registration receipt did not come from "outside" the trial court proceedings. *People v Budzyn*, 456 Mich 77, 91-92; 566 NW2d 229 (1997). The sex offender registration receipt was included in exhibit 1, which was admitted into evidence with the consent of defendant. The jury was instructed that, in reaching a verdict, it could only consider the evidence that was properly admitted. Properly admitted evidence, the jury was instructed, included the sworn testimony of the witnesses and the exhibits admitted into evidence. Because the sex offender registration receipt was admitted into evidence as part of exhibit 1, it was evidence that the jury was allowed to consider in reaching a verdict. We acknowledge that the sex offender registration receipt was not published to the jury or testified to by a witness during trial, but this does not change the fact that the registration receipt was part of an exhibit that was admitted into evidence. Accordingly, the trial court properly concluded that the sex offender registration receipt was not an extraneous influence.

A defendant is entitled to a *Remmer* hearing when the defendant raises a "colorable claim of extraneous influence" on a juror. *United States v Davis*, 177 F3d 552, 557 (CA 6, 1999). To be entitled to a new trial under *Budzyn*, 456 Mich at 88-90, the case in which our Supreme Court articulated the analysis to determine whether an

extraneous influence was error requiring reversal, a defendant must initially establish that the jury was exposed to an extraneous influence. Because the jury was not exposed to an extraneous influence, defendant was not entitled to a *Remmer* hearing or to a new trial under *Budzyn*. Accordingly, we affirm the trial court's orders denying defendant a *Remmer* hearing and a new trial.

(MCOA Op., 1-2, ECF No. 25-17, PageID.2135-2136.)

The Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, provides that a criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Irvin v. Dowd*, 366 U.S. 717 (1960). Notwithstanding a defendant's right to an impartial jury, it is a well established rule of common law that a jury verdict may not be impeached by the testimony of one or more jurors. *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *Mattox v. United States*, 146 U.S. 140, 149 (1892). The rule is supported by the important policy consideration of protecting jury deliberations from public scrutiny. *Tanner*, 483 U.S. at 119–20. Exceptions to the common law rule have been recognized in narrow circumstances where the jury has been exposed to an extraneous or "external" influence. *Id.* A trial court is required to investigate the issue of jury taint when there is a credible allegation of extraneous influence to ensure that the defendant's constitutional rights have not been violated. *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir.2000) (citing cases). A state court's factual findings concerning jury impartiality are presumed correct and may not be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Delisle v. Rivers*, 161 F.3d 370, 382 (6th Cir.1998) ("[W]e may only overturn a state court's findings of juror impartiality if those findings were manifestly erroneous.").

Examples of Supreme Court cases applying the common law exception for extraneous influences include *Mattox*, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had

murdered other victims before, and testimony that the jurors had read a newspaper article during deliberations characterizing the evidence against the defendant as exceptionally strong. *See Mattox*, 146 U.S. at 142–43, 149. The *Mattox* Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Id.* at 149.

Similarly, in *Parker v. Gladden*, 385 U.S. 363 (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's comments that the defendant was a wicked, guilty man and that if there was anything wrong with convicting the defendant, the Supreme Court would correct it. Although the Court did not directly address the admissibility of the juror testimony, it noted that the bailiff's "expressions were private talk, tending to reach the jury by outside influence." *Id.* at 364 (internal quotation marks omitted). The Supreme Court held that the case was controlled by the Sixth Amendment, which guarantees an accused the right to trial by an impartial jury and to be confronted by the witnesses against him. *Id.* The Court noted that the statements made by the bailiff were not subjected to confrontation or cross-examination, which "are among the fundamental requirements of a constitutionally fair trial." *Id.* at 364–65. The Supreme Court further concluded that the bailiff's comments "involve[d] such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 365 (internal citations omitted).

In this case, the trial court held a hearing and conducted extensive questioning of both the prosecutor and defense counsel. After hearing all arguments, the trial court concluded that the receipt was not extrinsic evidence. The trial court began by noting that he thought there was a good argument that Petitioner had waived the issue. (Sentencing Hr'g Tr. 37, ECF No. 25-11, PageID.1972). The trial court then concluded that the receipt was not extrinsic evidence. (*Id.* at

PageID.1974.)  In doing so, the trial court implicitly rejected the Petitioner's suggestion that the receipt was somehow not properly admitted.  Petitioner has failed to offer any evidence that the state court's factual findings were manifestly erroneous.  *See* 28 U.S.C. § 2254(e)(1); *Delisle*, 161 F.3d at 382.

Finally, even if Petitioner could show a constitutional violation, any error was harmless. On habeas review, harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), not under the *Chapman v. California*, 386 U.S. 18, 24 (1967) standard. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." 551 U.S. at 121-22 (citations omitted)); *see Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015); *see also Kelly v. McKee*, 847 F.3d 317, 327 (6th Cir. 2017).  The Court finds that any constitutional error regarding the inclusion of the receipt in the exhibit book did not have a substantial and injurious effect on the jury's verdict.  As extensively discussed above, the evidence of petitioner's guilt was overwhelming. *See, e.g.*, *Keys v. Booker*, 798 F.3d 442, 454 (6th Cir. 2015); *Cole v. Tribley*, No. 12-14826, 2015 WL 471388, at *10 (E.D. Mich. Feb. 4, 2015). Accordingly, even if constitutional error had occurred, it was harmless.

## II.    Sufficiency of the Evidence.

During his direct appeal, Petitioner argued that his convictions were against the great weight of the evidence.  In his original habeas petition, Petitioner modified this ground for relief by claiming that there was insufficient evidence to support his convictions for second-degree murder

and felony-firearm. As noted above, in an opinion and order dated February 12, 2014, Chief Judge

Robert J. Jonker determined that Petitioner had not exhausted his sufficiency claim and held the case

in abeyance pending exhaustion or removal of the unexhausted claim. (ECF No. 11.) Petitioner then

returned to the state court by filing a motion for relief from judgment, which was denied by the trial

court as well as the Michigan Court of Appeals and the Michigan Supreme Court, all of which cited

Michigan Court Rule 6.508 in denying Petitioner's motion. Respondent contends, therefore, that

Petitioner has procedurally defaulted this claim of error.

　　　　　When a state-law default prevents further state consideration of a federal issue, the

federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine

whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider

whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state

court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent

and adequate" state ground properly foreclosing federal habeas review of the federal constitutional

claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d

423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*,

274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar

a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See*

*Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

　　　　　If a petitioner procedurally defaulted his federal claim in state court, the petitioner

must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual

prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal

habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Here, the Michigan trial court's decision denying Petitioner's motion for relief from judgment is the last reasoned opinion in his case. The trial court denied Petitioner's claim based on Michigan Court Rule 6.508(D)(3), which states that "[t]he court may not grant relief to the defendant if the motion . . . alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter." MICH. CT. R. 6.508(D)(3). A denial of relief based on this state rule is an "independent and adequate state ground sufficient for procedural default." *Ivory v. Jackson*, 509 F.3d 284, 292 (6th Cir. 2007). Because Rule 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place many years later, the rule is "firmly established" for purposes of Petitioner's action. *See Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012) (citing *Ivory*, 509 F.3d at 292). Consequently, Petitioner's sufficiency claim is procedurally defaulted.

When a petitioner has procedurally defaulted a claim, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999). To

show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Petitioner has not argued or provided new evidence or reasoning to show cause for failing to raise his sufficiency claim on direct appeal nor has he argued he is actually innocent. Therefore, Petitioner's sufficiency claim currently before this Court is procedurally defaulted.

Even if Petitioner could somehow excuse his procedural default, he would not succeed on this claim. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh

the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

The prosecution presented evidence that Petitioner was with Andrea Parnell at her residence during the early morning of November 7, 2009. Cynthia Hadden, who was in a bedroom next to Andrea's and could hear into the room through a heating vent, testified that she heard Andrea tell Petitioner, through his nickname, "Tutu" to stop messing with her. (Trial Tr. I, ECF No. 25-4, PageID.995.) Later, a male and female were seen outside the Outrider's Motorcycle Club. A detachable hood matching Andrea's jacket was recovered outside the club. (Trial Tr. III, ECF No. 25-6, PageID.1333.)

Jelah Tunstull testified that Petitioner had bragged, on several occasions, about having access to a gun. (Trial Tr. II, ECF No. 25-5, PageID.1153.) Kenneth Wallace testified that he had in fact seen Petitioner with a gun. (Trial Tr. II, ECF No. 25-5, PageID.1185-1186.) Kenneth Wallace also testified that Petitioner admitted to him, on the phone, that he had shot someone, and he could hear a female voice saying her head hurt. (*Id.* at PageID.1180.) Later that afternoon, Petitioner spoke with Jamar Frederick at the Glen Oaks apartment. Jamar testified that Petitioner was wearing a black hoodie and jeans, and that when they spoke, Petitioner stated he had shot someone. (Trial Tr. V, ECF No. 25-8, PageID.1647.) Petitioner then admitted, a third time, that he had shot someone when Mitchell Pierce asked Petitioner if he had committed the murder, and Petitioner shook his head in the affirmative while grinning. (Trial Tr. V, ECF No. 25-8, PageID.1679-1680.) Detective Luker testified that he found a black hoodie in a dumpster in front of the Glen Oaks Apartment. (Trial Tr. VI, ECF No. 2509, PageID.1734.) It was the same shirt that

Ann Hunt had done some DNA analysis on. (*Id.*) The blood stain on the shirt matched Andrea Parnell's DNA profile. (Trial Tr. IV, ECF No. 25-7, PageID.1504-1505.)

In sum, viewing the evidence in the light most favorable to the prosecution, sufficient evidence exists that would allow a rational trier of fact to find the essential elements of the crimes that Petitioner was convicted of. Petitioner's procedurally defaulted claim, therefore, also fails on the merits.

### Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Therefore, I recommend that a certificate of appealability should be denied.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated: August 10, 2017        /s/ Ray Kent
                                      RAY KENT
                                      United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).